IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Larry A. Hill, | ) | |
| | ) | Cr. No. 3:08-734 |
| Movant, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **OPINION AND ORDER** |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

        On September 4, 2007, Movant Larry A. Hill was called to testify before a grand jury

investigating a Ponzi scheme[1] orchestrated by Messrs. Tony Pough, Joseph Brunson, and Timothy

McQueen, all of whom were associated with Capital Consortium Group (CCG), among other

entities.  See United States v. Brunson, Cr. No. 3:08-615.  Movant was questioned under oath as to

whether he had ever invested money with CCG.  According to the record before this court, Movant

testified as follows:

> Q:    Grand Jury Exhibit Number 1 is in front of you. You've reviewed it already,
>        I believe, but have you - and you're free to review it again, if you would like.
>        Have your personally participated in any of the programs offered and
>        described in Grand Jury Exhibit Number 1?
>
> A:    Yes I did.
>
> Q:    Which one?
>
> A:    I had a contract on the credit card program.
>
> Q:    Was that your only contract with them?
>
> A:    To – to the best of my knowledge.

---

[1] A Ponzi scheme is a fraudulent investment operation where the operator, an individual or
organization, pays returns to its investors from new capital paid to the operators by new investors,
rather than from profit earned by the operator. http://en.wikipedia.org/wiki/Ponzi_scheme (found
April 14, 2014).

Q:     Well are you sure that you've only made one investment with the Capital Consortium Group?

A:     To the best of my knowledge.

Q:     Mr. Hill, if I told you that I have information that you've participated in nine different investment programs offered by the Capital Consortium Group, would that be correct or incorrect?

A:     I have no idea.

Q:     So the CCG long-term program, signed May 12, 2006 with a payoff date of March 25th of '07. You don't recall if you participated in that?

A:     No, I don't.

Q:     The only one of all these programs I have listed that you recall is this credit card program, is that right?

A:     Yes, credit card was satisfied, so that one, yes sir.

Q:     How much did you pay to have that credit card satisfied?

A:     I can't remember right offhand.

Q:     If I told you that you paid $2,500 to satisfy a $23,390 debt, would that be correct?

A:     Maybe. Sounds familiar.

Q:     And if I told you with part of their signature and student loan program, you gave them $1,500 to satisfy a $10,447 debt, would that be correct or incorrect?

A:     I'm not sure.

Q:     If I told you that you paid a fee of $2,500 for -- to satisfy a mortgage of $53,878.37 that would be correct or incorrect?

A:     I'm not sure. I'm not sure.

Q:     If I told you you gave them $4,500 to satisfy $111,615 mortgage, that would be correct or incorrect?

2

A:    That, I'm not sure.

Q:    If, I told you that you paid them a $5,000 fee to payoff $100,000 automobile loan would that be correct or incorrect?

A:    That I -- I'm not sure. I'm not sure about all of that.

Q:    If I told you you gave them a $5,500 fee for a mortgage satisfaction of $200,000 would that be correct or incorrect?

A:    That, I'm -- I'm not sure about that either.

Q:    So you're not sure about any of these debts even though they're paying off almost – at least $500,000 of debt that you have, is that right?

A:    I'm not sure about that.

            ***

Q:    Home many homes do you own?

A:    Two homes.

Q:    How much did you pay for the two homes?

A:    I'm -- I'm not sure. I'd have to look at my contract. I'm not sure.

Q:    You have no idea how much you paid for your house?

A:    My house, I paid seventy-five or six in there, seventy, something like that, but I don't . . . .

Q:    Okay, how about your second home?

A:    That is in the neighborhood of $50,000.

Q:    A $50,000 house?

A:    Yes sir.

Q:    But you can't recall whether or not you gave money to the Capital Consortium Group to help you pay off these loans?

      A:     Those I wasn't sure of.

ECF No 2, 1-3.

     Movant was indicted on July 17, 2008. The government alleged that, contrary to his statements under oath, Movant had invested at least $36,150 with approximately eleven programs offered by CCG, with an expectation of receiving in excess of $500,000 in benefits. Movant was charged with making false material declarations to a grand jury, in violation of 18 U.S.C. § 1623 (Count 1); and obstructing the administration of justice, in violation of 18 U.S.C. § 1503(a) and 1503(b)(3) (Count 2). On September 10, 2008, Movant filed a letter indicating his decision to waive his right to counsel. On September 30, 2008, Respondent United States of American filed a motion to appoint standby counsel, which motion was granted by United States Magistrate Judge Joseph R. McCrorey on October 21, 2008. The Magistrate Judge thereafter appointed standby counsel on October 22, 2008.

     On October 29, 2008, Movant and standby counsel appeared before the court for a pretrial conference. At the hearing, Movant refused to rise and to address the court as directed during the hearing. The court converted the appointment of defense counsel from standby to general counsel and informed Movant that he would be subject to penalties for contempt for further instances of misconduct. After the hearing, Respondent moved for a psychiatric examination as to Movant on the grounds that he had submitted a series of bizarre and nonsensical filings[2] and had failed to abide by the court's directives.

---

[2] For example, on August 26, 2008, Movant filed a nine page "Conditional Acceptance" wherein he agreed to answer the indictment "upon proof of claim with full commercial liability" of numerous facts or legal arguments. ECF No. 25. On September 26, 2008, Movant filed a "Notice Ex Parte for Declartory Judgment Order and Relief" alleging defamation and perjury by "the same ficticious entity, THE UNITED STATES OF AMERICA which amounts to fraud." ECF No. 48.

A superseding indictment was filed November 20, 2008, charging Movant with making false material declarations to a grand jury, in violation of 18 U.S.C. § 1623 (Count 1); and obstructing the administration of justice and aiding and abetting, in violation of 18 U.S.C. § 1503(a) and 1503(b)(3) and 18 U.S.C. § 2 (Count 2). The court held a hearing as to Respondent's motion for a psychiatric examination on November 24, 2008. On November 25, 2008, the court issued an order directing that Movant be examined as to his mental condition, specifically as to whether he was suffering from a mental disease or defect rendering him mentally incompetent to understand the nature and consequences of the proceedings against him, or to assist properly in his defense, as defined in 18 U.S.C. § 4241(a), and whether the defendant was insane at the time of the offense charged, as defined in 18 U.S.C. 4242(a). A report returned to the court on or about March 17, 2009 indicated that Movant was mentally competent and not insane at the time of the offense charged.

Movant proceeded to trial on May 11, 2009. Respondent called Special Agent Ron Grosse of the Federal Bureau of Investigation, who is assigned to investigate white collar or fraud cases. ECF No. 198, 54-55. Grosse testified that he became involved in the investigation of CCG around June 15, 2007. Id. at 55. During the investigation, Grosse developed evidence that Movant not only was a depositor with CCG, but also was an Independent Representative, that is, a promoter of CCG's programs. Id. at 62.

Grosse testified that he and his partner, Special Agent Aaron Hawkins, experienced difficulty in contacting Movant and in communicating with other investors of CCG. Id. at 66. As a result, grand jury subpoenas were issued from the United States Attorney's Office, including one for Movant. Id. at 68. The evening of July 12, 2007, Grosse and Hawkins attempted to serve Movant at his residence, but Movant would not come to the door. The subpoena was left inside the door and

5

a message was left with Movant that he had been served and that he was required to testify before a grand jury on August 7, 2007. Id. at 74. Movant did not appear before the grand jury as scheduled. Id. at 76. Hawkins contacted Movant, who claimed he was out of the area and would contact Hawkins in an hour. He failed to do so. Id. at 77. However, Movant did appear before the grand jury the next day, August 8, 2007. Id. at 80.

Respondent called Winston Holliday, Assistant United States Attorney, to the stand. Holliday is assigned to the general crimes section and investigates fraud or white collar cases. He was assigned to an investigation that later became a prosecution of CCG. ECF No. 199, 24.

Holliday testified regarding Movant's grand jury appearance. According to Holliday, on August 8, 2007, Movant appeared and made a statement to the grand jury denying that he had been properly served with the subpoena. Movant then was advised of his rights and was sworn in. Id. at 42-44. Movant refused to answer questions. As a consequence, he was brought before the court and it was explained to him when he could refuse and when he could not refuse to answer certain questions. Id. at 45.

Holliday recounted the importance of discovering the extent of CCG's business dealings and the representations made to investors. Id. at 46-48. Holliday testified that Movant was nonresponsive during questioning. For example, when asked had he heard of CCG, Movant stated, "I have read a lot in the paper about the Capital Consortium Group, yes, I have." Id. at 50. Movant refused to answer when asked whether he had been a depositor or invested money with CCG. Id. Movant again was brought before the court, and was given an explanation as to when he could and could not refuse to answer questions. Id. at 52. Movant informed the court, "I can answer those questions, it is not a problem." Id. Movant continued, "I don't have anything to hide. My only thing

6

is that these are private." Id. The court instructed Movant that he could not refuse to answer questions based on his assertion that such questions were private. Id. at 53.

Movant was subpoenaed to testify before the grand jury again on September 4, 2007, to include bringing records. Id. at 54. With respect to Movant, Holiday testified that, "[b]eyond the veracity or the reliability of the CCG records, we still wanted to know who he had had conversations with of the three principles or anyone else that was acting on behalf of CCG; what he had been told about where the money was invested; particular victims that he might have interacted with, especially as an [Independent Representative]." Id. at 56. Holliday stated that Movant again was evasive in his responses to questions propounded before the grand jury.[3] Movant thereafter commenced asserting his Fourth Amendment right to privacy as a basis for refusing to answer questions. Id. at 60. Holliday testified:

A.  I asked:

"How much money did you deposit with capital consortium group?" He indicated, "That is private information and I stand on my fourth amendment right to privacy." I asked, "Did you receive a return from the Capital Consortium Group?" He responded, "That is also private information, I stand on my Fourth Amendment right to privacy." I asked, "How much money did you receive as a return?" He said, "That also is private information. I stand on my Fourth Amendment right to privacy." "Who was your point of contact with Capital Consortium Group?" He said, "That also is private information, I stand on my Fourth Amendment right to privacy."

---

[3] For example, when asked what CCG was, Movant stated, "A ministry." Holliday testified, "I asked him: 'And what's the purpose of their ministry?' His response, 'That I'm not here to speculate in. Actually the only person I think can answer hat question would be the founders.' 'What's your understanding of what the ministry purpose is of the Capital Consortium Group?' He responded, 'I am not here to speculate.' Then I asked: 'Have they ministered to you?' He said, 'If they did, that would be personal, private information.'" ECF No. 199, 59.

Id. at 61.

Holliday continued to ask questions that were answered in a similar manner by Movant. Movant was brought before the court and admonished that he could not assert a right to privacy as a means to avoid answering questions before the grand jury. Id. at 70. Movant was given a final opportunity to answer questions or be subject to contempt. Id. at 71. Holliday testified that Movant often responded to questions in a vague manner:

A.    I asked:

"How much did you deposit with them?" He said, "That I'm not sure." I said, "Approximately how much did you deposit with them?" He said, "I'm not sure." I asked, "Did you receive a return?" He asked, "Did I receive a return?" I said, "In other words, the money that you gave them, did they pay you money in return for the investment that you made?" He said, "I made no investment." I said, "Did you deposit money with the Capital Consortium Group?" He said, "Yes, I did." I went further, "And I asked you how much you deposited, for what it is worth, syntax and terminology seems to be very important, that is why I shift from investment to deposit, at least terminology." So I saw that as a way of getting an answer to my question. Line 14, "And did I ask you how much you deposited?" You said, "You were not sure." He repeats, "Not sure."

Id. at 73-74.

Holliday testified among other things, as to Movant's responses to questions propounded as to his participation in various loan satisfaction programs as recited hereinabove. Id. at 84-89. Movant was instructed that he had the opportunity to contact Respondent should he wish to correct his testimony. Id. at 93. He did not do so.

Respondent next offered Jeffrey J. Bruning of the Federal Bureau of Investigation as a witness. Id. at 121. Bruning testified that the majority of his career had been spent investigating financial crimes or white collar crimes. Id. at 123. Bruing stated that he was involved in the

execution of a search warrant on Movant's property on January 10, 2008. Id. at 124. Bruning testified that he was looking for evidence that Movant had invested in CCG or anything dealing with the Three Hebrew Boys. Id. at 126. Located at Movant's residence was a sign-in registry; contracts bearing seals for different investment programs with CCG bearing Movant's name for different investments; correspondence from CCG to Movant indicating the sending of referral fees on behalf of either account numbers or individual names; a letter from CCG to Movant regarding his credit card satisfaction; correspondence from Movant inquiring as to long-term distribution payments and outstanding referral fees; a spreadsheet containing names, various programs, referral fees, and other information; checks from third parties paid to the order of CCG; copies of checks from CCG to Movant; contracts of third parties with CCG noting Movant as representative; and an "Independent Representative Handbook for Capital Consortium Group Policy Procedure November 2005" containing Movant's name inside the back cover. A laptop computer also was recovered from Movant's residence. Id. at 131-45.

Among other witnesses, Respondent presented testimony of Somera Samuels, who had been compensated for computer and other work she performed for CCG in 2006. Samuels testified regarding the debt satisfaction programs available through CCG and those in which Movant had invested. She testified that she had trained Independent Representatives and that she had attended seminars at which the Three Hebrew Boys had made representations that they were investing in the foreign exchange market. Id. at 147-59. Samuels testified as to the returns anticipated in long and short term residual programs, as well as debt satisfaction programs for homes, automobiles, and credit cards, as well as payoff of past student loans or deposits toward future college expenses. The debt satisfaction programs ranged from twelve to twenty-four months to mature. Id. at 159-64.

9

Samuels also testified that in July of 2006, CCG became computerized such that Independent Representatives could log into the system and print out appropriate certificates to reflect the initial deposit made by an investor.  Id. at 164-65.

With respect to Movant specifically, Samuels identified (1) a certificate for a $1,000 deposit for a 10 percent long-term residual; (2) a certificate for a $8,500 deposit for a 10 percent long-term residual; (3) a certificate representing a credit card program whereby Movant submitted $2,500 in order to have seven credit cards paid within twelve months; (4) a certificate representing a mortgage payoff to Wells Fargo whereby he paid $2,500 to satisfy a mortgage of between $50,000 to $100,000; (5) a certificate representing a mortgage satisfaction program whereby Movant paid $4,500 to pay a mortgage of $111,615.63; (6) a certificate representing a $4,500 deposit into a future auto satisfaction program;[4] (7) a certificate representing a future mortgage program for which Movant submitted $4,500 to obtain future funding of $200,000; (8) a certificate representing a signature student loan, whereby Movant deposited $1,500 to pay his college loans totaling $10,447.48; (9) a certificate representing a $500 deposit for a 10 percent long-term residual program; (10) a certificate representing a short term deposit of $2,500 by which he expected a return of $4,000 within six months; and (11) a student loan by which Movant deposited $1,500 in order to payoff a student loan of $10,163.66 within fifteen months.  Id. at 168-86.  Samuels also testified regarding referral fees received by Movant.  Id. at 190-91.  Respondent also introduced testimony from Michael Cooper, an investor for whom Movant acted as Independent Representative.  Id. at 209-25.

---

[4] According to Samuels, Movant submitted $4,500 to purchase a car between the range of $50,001 up to $100,000.  Under the terms of the future auto satisfaction program, a depositor would be instructed prior to the end of the sixteen month term of the program to identify a vehicle to purchase. CCG would pay the down payment and the first three payments, and on the fourth payment would pay off the vehicle.  Id. at 179-80.

On the final day of trial, Respondent called Special Agent Aaron Hawkins of the Federal Bureau of Investigation to the stand. ECF No. 200, 7. Hawkins testified that he had worked white collar crime for thirteen years. Id. at 8. Hawkins recounted his involvement in the Ponzi scheme perpetrated by the Three Hebrew Boys and his attempts to interview Movant. Id. at 12-16. Hawkins testified that he reached Movant by telephone and requested a meeting to discuss CCG. Movant twice referred Hawkins to the corporate attorney, but would not provide the identity of that individual. Hawkins testified that Movant then hung up on Hawkins. Hawkins called back and told Movant that the alternative was to be subpoenaed to testify before the grand jury. Movant told Hawkins to subpoena him and again hung up the telephone. Id. at 17-18.

Hawkins testified regarding his and Grosse's attempt to serve Movant with a copy of the grand jury subpoena on July 12, 2007. Hawkins testified that he and Grosse knocked on the door to Movant's residence, to no avail. Hawkins called Movant, and told him that they needed to meet so that Movant could be served with the subpoena. According to Hawkins, Movant responded that he had nothing to say and that it was up to Hawkins to find him. Id. at 21. Hawkins noted that Movant did not appear at the grand jury proceeding on August 7, 2007.

Hawkins testified that during this time he received a telephone call from Sakima Bey, who held himself as the attorney for CCG. Id. at 24. Hawkins testified that Bey does not have a license to practice law in South Carolina and is not a graduate of an accredited law school. Id. Ultimately, according to Hawkins, he told Bey to tell Movant to appear before the grand jury on August 8, 2007, or Movant would be arrested. Id. at 26.

Respondent reviewed Movant's September 4, 2007 grand jury testimony with Hawkins. Hawkins recounted that Movant testified, among other things, that he did not know how or whether

11

CCG invested money; had no idea investors were required to sign a contract with CCG; did not admit to any other CCG investments other than the credit card satisfaction program. Id. at 30-33. Hawkins then described the investigation into Movant's potential perjury, which included grand jury subpoenas for bank records that included nine cashier's checks made payable to CCG by Movant. Based on these and other records, the search warrant of Movant's residence was obtained. Id. at 33-39.

According to Hawkins, five or six individuals executed the search warrant at Movant's residence. Hawkins testified similarly to Grosse regarding the evidence located during the search. Hawkins further testified regarding a printout of a spreadsheet that appeared to show Movant's records regarding investors in CCG who participated under Movant as Independent Representative, including varying programs, dates of investments, term dates for the investments, and the referral fee and the date it was paid. Id. at 44-51.

Hawkins also testified that the laptop seized from Movant's residence contained a spreadsheet showing the various investors put into CCG programs by Movant, the amount the investor expected to receive, the amount the investor paid, and the date of the creation of the investment. Id. at 54. Hawkins observed that the laptop contained additional spreadsheets used to track referral fees owed to Movant, and that the information would have been helpful to the investigation in August 2007. Id. at 54-57. Hawkins testified that some of Movant's debts were confirmed, although a couple were not. Id. at 58. Hawkins confirmed the payoff of a $53,878.37 mortgage with Wells Fargo in October 2007; the payoff of a $9,103.12 debt to Citifinancial in May 2006, the payoff of a debt to Aurora Loan Services in the amount of $1,344.36, and the payoff of a student loan in September 2007. Id. at 58-62. Hawkins testified that the investigation uncovered

eleven certificates in Movant's residence that represented participation in eleven different CCG programs.  Hawkins testified:

> From those certificates and the documentation that was attached to those certificates and bank records, we learned that Mr. Hill paid somewhere between 36 and 37,000 dollars to participate in these 11 different programs, of which he would have expected to derive a total benefit of existing debt payoff of roughly $208,000 and have future debt of $300,000 paid off, and also to receive a $4,000 payoff for a Christmas program, as well as a residual monthly income from participation in three long-term programs cumulatively a thousand dollars a month. And based on what we were told by multiple -- ultimately we know now from multiple witnesses is that that thousand dollars would go on as long as the money is in the program.

Id. at 64.

Hawkins further testified that Movant received approximately thirteen checks that totaled just over $10,000 in referral fees as a result of being an Independent Representative.  Id. at 66.  Hawkins testified that receipt of the information in August 2007 would have advanced the investigation into CCG and the Three Hebrew Boys.  Hawkins further testified that Movant's perjury impeded the investigation and subsequent prosecution of CCG.  Id. at 67-68.

Movant elected to testify in his defense.  Movant first explained that he was employed as the head of the payroll department at South Carolina Department of Public Safety.  He testified that during the one month period between August 3, 2007 and September 3, 2007, he processed 4,650 payroll records.  Id. at 78.  With respect to the grand jury hearing on September 4, 2007, Movant testified as follows in response to questions from his trial counsel:

> A.    . . . Now, during the grand jury hearing, there were the questions actually was a little confusing to me. And my answers, "I don't remember," is actually I didn't remember what that cost was.  Now, but some of those questions to me, if I could, just one of the questions, I disagreed with several things in the questions. So actually that question had more than one answer. So, one answer would not have been sufficient for that question.

Q.    Why didn't you say that? Why didn't you say to the questioner, that answer -- that question calls for two different answers? Why didn't you say that and explain further?

A.    Well, actually, I just said that the answer that I gave I spoke of just one area and really that was the dollar amount. I wasn't sure of the value of that program.

Q.    Let's talk about what you did admit to the grand jury. Did you say to the grand jury that the Capital Consortium Group, that you had entered into a contract with Capital Consortium Group relating to the payment for a credit card program?

A.    Yes, I did.

Q.    Why did you tell them about -- did you answer that one correctly and truthfully?

A.    Yes, I did.

Q.    Why did you say that one and deny or not answer about the other nine or ten, tell the jury.

A.    Well, now, that one, evidently, that is the only one that was satisfied because that is the only one in which the termination date where it had matured. That is the only contract that had matured. All of these contracts had maturity dates. Nothing happened until the maturity date. Now, on the other contracts that they were speaking of, I disagreed with what they were categorizing them as. I don't know if they was talking about other contracts because now, for instance, they said nine investment contracts. Well, in my opinion, I did not have nine investment contracts because, as an accountant, in my understanding and my belief, and if I could, could I take judicial notice? My belief of an investment, the legal definition that I use, I go back, that firms my belief is from the Black Law Dictionary, Black Law Legal Dictionary, the 8th edition. And it says that the definition of an investment is "an expenditure to acquire property or assets to produce revenue. An income producing profiting." None of these contracts were income producing in my opinion. Now, Black Law Dictionary, 8th edition, give the definition of an investment. The definition to invest it says is an "outlay of money for profit." Now, these contracts were debt service. So it is not –

Q.    They were what?

A.     Debt service.

Q.     Debt service?

A.     Yes. They were not producing income. And the future contracts, they were what is called -- what is classified as onerous contract. What an onerous contract is is a contract in which the offeror, and the offeror, that is a contract term, these programs that you saw, they are governed by a contract. These are contracts. The elements of a contract you have offeror. Offeror is the person who has something that you want, that is Capital Consortium Group, they were the offeror. The offeree would be the constituent, me. so, you got an offeror, you have an offeree. Now, you know, for a contract to be binding, there must be consideration. Now, the consideration, which would be the profit fee, that is the consideration that shows the interest in which the offeror have. That is the same thing you purchasing real estate, you put up earnest money, not an investment. You are showing your interest in that property.

Q.     Mr. Hill, let me ask this: it is your belief, therefore, that the question that you answered on September 4th, 2007, before the grand jury –

A.     Yes.

Q.     -- as proposed to you by the United States Attorney, were those truthful answers or were they not truthful answers?

A.     Yes, they were truthful answers in my behalf, in my belief, yes.

ECF No. 200, 79-82.

Movant testified that he answered "I am not sure" to many questions propounded during the grand jury hearing because he needed to see the documentation to know exactly what the dollar amount of the program was.  Id. at 84.  Movant stated that he answered the questions to the best of his knowledge.  Id.  Movant testified that he found many of the questions asked during the grand jury proceeding to be confusing.  For example, Movant's trial counsel questioned Movant as follows:

Q.     The last question posed to you by the United States Attorney:

"But you can't recall whether or not you gave money to Capital Consortium Group to help you payoff those loans?"

15

A.   His questions were very confusing and I am a very particular person who worries.  And not knowing the volume of work that I did, but also with the words and to me when someone says you gave somebody something, the word "gave" is the same thing as a gift.  You don't look for anything in return if you give someone something.  So, I did not give Capital Consortium Group anything. I contracted with them.  They had an obligation and I had an obligation.

Q.   Mr. Hill, that would relate to all of the government's exhibits relating to the exhibits you have in front of you, . . . of the fives with the seal on them, that was your interpretation of what you had done and what your responsibilities to Capital Consortium Group were?

A.   Well, with the future program, I did not mention this, but the purchase amount, not only just automobile, it says purchase amount of $100,000. The purchase amount, that is not the value of the automobile. See, a future program, you cannot determine value because it is in the future and you have not even gone to the lending institution yet to even apply for credit to purchase a home or a car. So you don't know what the value is going to be. So, on this contract, what they do is, they give the maximum allowable cost for the category in which you choose. Now, she mentioned yesterday the category that I choose was for an automobile anywhere from fifty thousand dollars and one cent to a hundred thousand, that is a category. Could be an automobile for 55,000, it could be 51,000 it could be 75,000. But on this certificate, they gave the maximum cost. So this is not debt, this is not evidence of a debt. All this is is telling the constituent, you will not -- you will -- this is your allowable cost, you cannot go over this cost. So actually for them to say that I have a hundred thousand dollar debt, this is imaginary debt because I never even went to the bank to get a loan. I didn't have an auto loan, never had an auto loan. I never had a two hundred thousand dollar mortgage. I never even got to the process of going through the closing procedure. So that two hundred thousand dollar mortgage is fabricated. It never existed. That is why they don't have the debt instruments on it because it never existed.

Id. at 92.

Movant testified that he did not appear at the grand jury proceeding on August 7, 2007 because he had been out of town when he received the telephone call from Hawkins.  Movant testified that when he returned to his residence later, there was no subpoena in his door.  Movant

considered that he had not been personally served.  Id. at 94.  He made the decision to appear on August 8, 2007 after numerous telephone calls from Hawkins.  Id.  Movant testified that he did, in fact, bring records to the grand jury proceeding in a portfolio, but no one requested them of him.  Id. at 95-96. Movant denied acting in a corrupt manner or making material false statements to the grand jury.  Id. at 101.  Movant further testified that he invoked what he believed to be an applicable right to privacy under the Fourth Amendment because he had signed a nondisclosure agreement in order to participate in the CCG programs.  Id. at 164-67.  According to Movant, he had an obligation to protect and keep confidential information not only about himself, but also about CCG and other persons involved in CCG programs.  Id. at 167.  Movant testified that if he breached the nondisclosure agreement, he would be obligated to pay CCG one million dollars immediately upon discovery either by CCG or any of its agents.  Id. at 168.

On May 19, 2009, a jury found Movant guilty on all counts.  A presentence investigation report (PSR) was prepared that assigned Movant a base offense level of 14 under U.S.S.G. § 2J1.3(a) as to Count One.  He received a three level enhancement for interference with the administration of justice pursuant to U.S.S.G. § 2J1.3(b)(2).  A cross-reference pursuant to U.S.S.G. § 2J1.3(c)(1) placed Movant at a level 24.  Movant received the same calculations as to Count Two.  Thus, his combined offense level was 24.  With a criminal history category of I, Movant's sentencing guideline range was fifty one months to sixty three months incarceration.

On December 2, 2009, the court sentenced Movant to incarceration for a period of sixty-three months, consisting sixty months as to Count 1 and sixty-three months as to Count 2, to run concurrently.  In addition, the court imposed a period of supervised release for three years as to Counts 1 and 2, to run concurrently.  Judgment was entered on December 8, 2009.

17

Movant filed a notice of appeal on December 10, 2009. In his appeal, Movant raised the following issues: (1) whether his grand jury testimony was constitutionally obtained; (2) whether the district judge committed plain error in failing to recuse herself from Movant's trial; (3) whether the court abused its discretion in admitting evidence of Movant's past involvement with the Capital Consortium Group, a group involved in a Ponzi scheme; (4) whether the evidence was sufficient to support Movant's convictions; (5) whether the indictment and jury instructions were impermissibly vague; and (6) whether the government used Movant's invocation of the Fifth Amendment as evidence against him at trial. The Court of Appeals for the Fourth Circuit affirmed Movant's conviction on August 11, 2011. See United States v. Hill, 442 F. App'x 811 (4th Cir. 2011).

On November 13, 2012, Movant, proceeding pro se, filed a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence. Movant asserts the following grounds for relief:

GROUND ONE: Mr. Hill was denied his right to choose counsel during both the trial and appellate stages of the prosecution.

GROUND TWO: The government violated its constitutional obligation to ensure both a fair trial and due process of law.

GROUND THREE: The district court denied Mr. Hill the right to an indictment by an impartial grand jury.

GROUND FOUR: Mr. Hill was constructively denied effective assistance of counsel during the trial stage of the proceedings.

GROUND FIVE: Mr. Hill was denied effective assistance of counsel during pretrial stage of prosecution.

GROUND SIX: Mr. Hill was denied effective assistance of counsel on appeal.

GROUND SEVEN: The district court denied Mr. Hill the right to due process of law and a fair trial.

GROUND EIGHT: The district court denied Mr. Hill the right to a public trial.

18

See generally ECF No. 241, 15-31.

On December 10, 2012, Movant filed a motion for recusal.  On January 14, 2013, Respondent filed a motion for summary judgment.  By order also filed on January 14, 2013, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), Movant was advised of the summary judgment procedures and the possible consequences if he failed to respond adequately.  Movant filed a motion for summary judgment and a response in opposition to Respondent's motion on February 25, 2013.

## I.  DISCUSSION

Pursuant to Fed. R. Civ. P. 56(a), the court shall grant summary judgment if the moving party shows that there is no genuine dispute as to any material fact and Respondent is entitled to judgment as a matter of law.  The evidence presents a genuine issue of material fact if a "reasonable jury could return a verdict for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  The facts and any inferences drawn from the facts should be viewed in the light most favorable to the non-moving party.  United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).  The party seeking summary judgment bears the initial burden of demonstrating to the district court that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party makes this showing, the opposing party must set forth specific facts showing there is a genuine issue for trial.  Id.

### Law/Analysis

A.    Motion for Recusal

Movant contends that the undersigned must recuse herself because she has personal knowledge of contested evidentiary facts and will be required to testify.  See 28 U.S.C. § 455(b)(1)

(providing that a judge must recuse himself "[w]here he has personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding").  According to Movant, the undersigned has knowledge regarding CCG and the underlying criminal case and was a witness to the validity of certain affidavits that led to the seizure of CCG assets and evidence making Movant's grand jury testimony suspect.

For the reasons set out in detail below, Movant's motion to recuse is moot as to his allegations of trial error Grounds One, Two, Three, Seven, and Eight), because these claims could have been raised on direct appeal.  As to Movant's allegations that he received ineffective assistance of counsel (Grounds Four, Five, Six), the proper analysis involves a determination as to whether counsel's performance was reasonable under prevailing professional norms.  The court is aware of no reason why it would be required to recuse itself from examining Movant's arguments regarding the representation he received during trial or on appeal.  Movant's motion to recuse is denied.

B.     Direct Appeal Issues (Grounds One, Two, Three, Seven, Eight)

The arguments raised in Movant's Grounds One, Two, Three, Seven, and Eight could have been raised on direct appeal.  These claims are procedurally defaulted.  Generally, when a movant attacks his sentence based upon errors that could have been but were not pursued on direct appeal, the movant must show cause and actual prejudice resulting from the errors of which he complains or he must demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack.  See United States v. Mikalajunas, 186 F.3d 490, 492-93 (4th Cir. 1999) (citing United States v. Frady, 456 U.S. 152, 167-68 (1982); United States v. Maybeck, 23 F.3d 888, 891-92 (4th Cir.1994)).  The existence of cause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance

20

of counsel. Id. And, in order to demonstrate that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack, a movant must show actual innocence by clear and convincing evidence. Id. Movant has made no such showing. Accordingly, the court turns to Movant's claims of ineffective assistance of counsel.

C.    Ineffective Assistance of Counsel (Grounds Four, Five, Six)

To prove ineffective assistance of counsel, Movant must show that trial counsel's performance was deficient. See Strickland v. Washington, 466 U.S. 668, 687 (1984). An attorney's performance is deficient when it is not reasonable under prevailing professional norms. Id. at 688. Movant also must demonstrate that he was prejudiced by trial counsel's alleged deficient performance, in that because of trial counsel's unprofessional errors, the result of the proceeding would have been different. See id. at 694. Strickland requires Movant to "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. at 690. The court then must "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Id. Even if counsel's performance is outside the wide range of professional assistance, an error by counsel will not warrant setting aside the conviction if the error had no effect on the judgment. Id. at 694. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" Id. at 689.    The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. Kimmelman v. Morrison, 477 U.S. 365, 374 (1986).

21

1.    <u>Ground Four</u>.  Movant first asserts that trial counsel was ineffective for failing to inform the jury that Movant subscribes to a belief system such that he denies the United States District Court is a true Article III Constitutional court, asserts that South Carolina State is a "foreign state" within the state of the Union and outside the State of South Carolina, and contends that, consequently, the court has no jurisdiction over him.  <u>See</u> Affidavit of Belief, ECF No. 83.  Movant states that such information would have convinced the jury that Movant's conduct before the grand jury was sincere, not deceptive and corrupt.

As an initial matter, the court notes that trial counsel fully examined Movant regarding the questions he was asked during the grand jury proceedings and his reasons for giving the answers that he did.  Trial counsel attests in an affidavit provided by Respondent that he attempted to show that Movant had not knowingly or willfully made any factual mistakes during his testimony but found the questions to be imprecise, or else did not fully explain his answers.  <u>See</u> Affidavit, ¶ 2(d), ECF No. 249-2.  Trial counsel attests that he perceived Movant's belief system to be not relevant to the facts and law of Movant's defense, and he resisted Movant's overtures to make the belief system a part of the trial.  <u>Id.</u>  In the court's view, trial counsel actions can be considered sound trial strategy.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689.[5]

Movant next contends that trial counsel should have utilized Movant's credit report to contradict the evidence adduced at trial regarding the amount of Movant's debt.  Movant asserts, as he did at trial, that the future mortgage and future car loan did not comprise debt, such that Hawkins' testimony should have been challenged in this respect.  In the court's view, Movant's credit report

---

[5] The court further notes that Movant was afforded a full opportunity to explain his belief system to the jury under cross-examination by Assistant United States Attorney.  <u>See</u> ECF 200, 102-08.  Thus, even if trial counsel's performance were deemed to be deficient, the court discerns no prejudice.

is of no relevance as to whether he made false statements to the grand jury and obstructed justice, as charged in the indictment. Trial counsel was not ineffective for failing to present Movant's credit report as evidence at trial.

Movant also asserts that trial counsel was ineffective for failing to subpoena witnesses to establish that Respondent misrepresented the evidence and that Movant's statements to the grand jury literally were true. Trial counsel avers that, to the contrary, Movant's witnesses would not have assisted him a trial. Trial counsel states that he did, however, obtain the services of a private investigator who interviewed witnesses called by Respondent at trial. According to trial counsel, the information gained by the private investigator was useful on cross-examination. ECF No. 249-2, ¶ 2(e). The court concludes that trial counsel's conduct was reasonable under prevailing norms.

2.    Ground Five. Movant first contends that trial counsel was ineffective for failing to call members of the grand jury to testify that they did not find Movant's conduct to be obstructive. Putting aside the secret nature of grand jury proceedings, see United States v. Johnson, 539 F. App'x 198, 201 (4th Cir. 2013), and the propriety of attempting to elicit testimony from members of the grand jury, the court observes that the grand jury did, in fact, return a true bill charging Movant with obstruction in violation of 18 U.S.C. § 1503(a) and 1503(b)(3). Movant's contention is without merit.

Movant further asserts that trial counsel was ineffective for failing to argue that Respondent's theory of the case was objectively untrue. Movant contends, as he did at trial, that the government's contentions were false, that he had only $195,000 of debt, and not $500,000. The court's review of the transcript demonstrates that Movant thoroughly explained his position regarding his deposits with CCG, either on direct examination or during cross examination. The jury took his views into

23

account and nevertheless found him guilty on all counts. The court concludes that trial counsel's conduct was reasonable under prevailing norms and, further, that Movant was not prejudiced by any errors he claims were made by trial counsel. Movant's Ground Five is without merit.

3.    Ineffective assistance of appellate counsel. Movant first contends that appellate counsel was ineffective for failing to raise on direct appeal the court's denial of Movant's right to self-representation.

Under 28 U.S.C. § 1654, a defendant in federal court has long been guaranteed the right of self-representation, and in Faretta v. California, 422 U.S. 806 (1975), the Court held that this right was rooted in the Sixth Amendment of the Constitution. United States v. Lawrence, 605 F.2d 1321, 1324 (4th Cir. 1979). The right to self-representation is not absolute, however, and may be terminated when a defendant deliberately engages in serious and obstructionist misconduct. United States v. Brunson, 482 F. App'x 811, 817 (4th Cir. 2012) (citing Faretta, 422 U.S. at 834 n.46). In this case, Movant had been allowed to proceed pro se but had refused to recognize the jurisdiction of the court, had abused the dignity of the courtroom by electing not to rise when the undersigned entered the room, and had filed numerous nonsensical motions and other documents, among other things. The court concludes that appellate counsel's performance was not deficient for failing to raise this issue on direct appeal.

Movant next contends that appellate counsel was ineffective for failing to raise on direct appeal an argument that the trial was scheduled such that the jury was forced to reach a verdict the same day as it received the case. In making his argument, Movant refers to the following colloquy between the court and counsel, which occurred outside of the presence of the jury:

Mr. Moore:    . . . As I understand it, your Honor isn't imposing time limitations on

|  | us [for final arguments], you just expect us to be reasonable, correct? |
|---|---|
| The Court: | I am not imposing any time limitations on you, but this jury is only here for today. They can't come back after today. |
| Mr. Moore: | I am going to move quickly, your Honor. |
| Mr. Delgado: | As will I, your honor. |

ECF No. 200, 174.

Movant contends that the jury's deliberations may have been affected by time constraints. It is true that the court may not coerce jurors into surrendering their views in order to reach a verdict. See Jenkins v. United States, 380 U.S. 445, 446 (1965). In this case, the trial originally was scheduled for May 11, 12, and 13, 2009. A personal matter arose on May 11, 2009 that affected trial counsel, and as a result the last two days of trial were rescheduled for May 18 and 19, 2009. The transcript of trial reflects that the jury commenced deliberations at 5:30 p.m. on May 13, 2009 and reached a verdict at 7:25 p.m. There was no interaction between the court and the jury during the two hour period. See ECF No. 200, 219. The court concludes that appellate counsel's performance was not deficient for failing to raise this issue.

Finally, Movant contends that:

The indictment permitted the jury to convict for noncriminal conduct. The indictment should have been dismissed or a bill of particulars ordered, and then the jury should have been instructed to identify the deceptive conduct upon which it found guilt. The district court committed multiple errors. Trial counsel was ineffective for not objecting and appellant counsel ineffective for not seeking plain error review.

ECF No. 241, 27.

"'[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.'" United States v. Dyess, 730 F.3d 354, 359 (4th

Cir. 2013) (quoting United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000)). The court summarily finds Movant's final claim for relief to be without merit.

D.    Movant's Motion for Summary Judgment

Movant moves for summary judgment as to Ground Three. As noted hereinabove, Ground Three is procedurally defaulted because Movant failed to raise his argument on direct appeal. Movant's motion for summary judgment therefore is denied as moot.

## III. CONCLUSION

For the reasons stated, Movant's motion for recusal (ECF No. 248) is **denied**. Respondent's motion for summary judgment (ECF No. 249) is **granted**. Movant's motion for summary judgment (ECF No. 252) is **denied as moot**. Movant's § 2255 motion (ECF No. 241) is **denied and dismissed**, with prejudice.

## IV. CERTIFICATE OF APPEALABILITY

A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that any assessment of the constitutional claims by the district court is debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. Miller-El v. Cockrell, 537 U.S. 322, 336-38 (2003); Rose v. Lee, 252 F.3d 676, 683-84 (4th Cir.2001). The court concludes that Movant has not made the requisite showing. Accordingly,

the court **denies** a certificate of appealability.

      **IT IS SO ORDERED**.


                    /s/ Margaret B. Seymour
                    Senior United States District Judge

Columbia, South Carolina

April 22, 2014




                    **NOTICE OF RIGHT TO APPEAL**

      **Movant is hereby notified that he has the right to appeal this order pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.**

27